**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **MAUD SMITH**, individually, and as Next Friend To I.S. and E.S., and as a beneficiary to the Wrongful Death of ADRIAN SMITH, | ) ) ) ) |
| **I.S.** and **E.S.,** minors, by and through their next friend, Maud Smith, individually, and as beneficiaries to the Wrongful Death of ADRIAN SMITH, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) No. _____ ) |
| **REYNOLDS COUNTY MISSOURI,** **TOM STOUT, SAMUEL HUFF,** **STEVE STOOPS, CODY NEWMAN,** **DONALD HORN, and** **JOHN AND JANE DOES 1 THROUGH 10,** | ) ) ) ) ) ) |
| Defendants. | ) |

**COMPLAINT**

COME NOW Plaintiffs, by and through their undersigned counsel, individually on behalf of Adrian Smith (deceased) and as beneficiaries to the wrongful death of Adrian Smith, and for their causes of action against the above captioned Defendants, state and allege as follows:

**INTRODUCTION**

1.     This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983 and 1988 against Defendants for committing acts, under color of law, in violation of Adrian Smith's rights secured under the Constitution and laws of the United States. This is also an action for wrongful death pursuant to Missouri's Wrongful Death Act and associated statutes, including but without limitation, Mo. Rev. Stat. §§ 537.080 and 537.090.

1

2.      While in the custody, care, and control of Reynolds County, Missouri, its local jail, Reynolds County Sheriff, Reynolds County Deputy Sheriffs, officers, administrators, jailors and dispatchers, the named Defendants denied Adrian Smith adequate and proper treatment for a known serious diagnosed medical psychiatric condition, and the named Defendants failed to protect Adrian Smith from the same known risks of suicide and to have his serious medical needs addressed. In this regard, Defendants acted with deliberate indifference to the risks associated with Adrian Smith's known serious diagnosed medical condition and suicide, and Defendants' actions and inaction amounted to a deliberate indifference to or tacit authorization of violative practices.

3.      As a direct and proximate result of Defendants' disregard of accepted standards, Adrian's rights, and his known, diagnosed, and recognized condition, Adrian Smith not only experienced extensive pain and suffering, he died a horrible and preventable death. Defendants' acts and omissions, occasioned under color of state law, evince a knowing and deliberately indifferent pattern of conduct in violation of both the Eighth and Fourteenth Amendments of the United States Constitution and state law, giving rise to both federal claims and pendent state law claims.

## **PARTIES**

4.      Plaintiff Maud Smith, at all times mentioned herein, was a resident of Reynolds County, Missouri and was the natural mother of Decedent Adrian K. Smith (hereinafter "Adrian") who died on November 19, 2018.

5.      Plaintiff I.S. is a minor and a resident of Missouri and is the natural son of Adrian K. Smith (deceased) and brings this action through his next friend, Maud Smith.

6.      Plaintiff E.S. is a minor and a resident of Missouri and is the natural son of Adrian K. Smith (deceased) and brings this action through his next friend, Maud Smith.

7.    Plaintiffs are within the class of individuals entitled to bring this action pursuant to RSMo. §537.080.

8.    Defendant Reynolds County is a political subdivision of the State of Missouri, organized and existing under the laws of the State of Missouri, and at all times herein was acting by and through its employees, departments, officers, administrators, servants, and agents.

9.    At all relevant times, Defendant Reynolds County owned, maintained, controlled, and operated the Reynolds County Jail in Centerville, Missouri where Adrian was detained from September 26, 2018 through the date of his death on November 19, 2018.

10.    Defendant Reynolds County is responsible for the wrongful death of Adrian, which was caused by the acts and/or failures to act of the duly appointed sheriff, deputies, jailers, and staff of the Reynolds County Sheriff's Office, who were acting under color of the law at the time, as well as the negligent acts and/or omissions of each and every other Defendant, who were employees and/or agents of Reynolds County, and were acting within their scope of employment.

11.    At all relevant times herein, Defendant Tom Stout ("Stout") was a citizen of Missouri and was the duly elected sheriff of Reynolds County and was employed as such by Defendant Reynolds County and was acting within the course and scope of his employment with Defendant Reynolds County, and was acting under the color of the laws, statutes, ordinances, regulations of the State of Missouri and pursuant to either official policy or the custom and practice of Defendant Reynolds County. Defendant Stout is sued in both his individual and official capacities. As Sheriff, Defendant Stout was the policymaker with respect to operations, general orders, and treatment of detainees, and responsible for the daily operations of the Reynolds County Jail and formed and adopted its customs. Defendant Stout was the commanding officer of the other individually named Defendants and, together with Defendant Reynolds County, had responsibility for the training,

supervision, discipline and conduct of those individually named Defendants as more fully set forth herein.

12.     At all relevant times herein, Defendant Samuel Huff ("Huff") was a citizen of Missouri and was a deputy sheriff in Reynolds County and was employed as such by Defendant Reynolds County and was acting within the course and scope of his employment with Defendant Reynolds County, and was acting under the color of the laws, statutes, ordinances, regulations of the State of Missouri and pursuant to either official policy or the custom and practice of Defendant Reynolds County. Huff is sued in both his individual and official capacities.

13.     At all relevant times herein, Defendant Steve Stoops ("Stoops") was a citizen of Missouri and was a deputy sheriff in Reynolds County and was employed as such by Defendant Reynolds County and was acting within the course and scope of his employment with Defendant Reynolds County, and was acting under the color of the laws, statutes, ordinances, regulations of the State of Missouri and pursuant to either official policy or the custom and practice of Defendant Reynolds County. Stoops is sued in both his individual and official capacities.

14.     At all relevant times herein, Defendant Cody Newman ("Newman") was a citizen of Missouri and was a deputy sheriff in Reynolds County and was employed as such by Defendant Reynolds County and was acting within the course and scope of his employment with Defendant Reynolds County, and was acting under the color of the laws, statutes, ordinances, regulations of the State of Missouri and pursuant to either official policy or the custom and practice of Defendant Reynolds County. Newman is sued in both his individual and official capacities.

15.     At all relevant times herein, Defendant Donald Horn ("Horn") was a citizen of Missouri and was a deputy sheriff in Reynolds County and was employed as such by Defendant Reynolds County and was acting within the course and scope of his employment with Defendant Reynolds

County, and was acting under the color of the laws, statutes, ordinances, regulations of the State of Missouri and pursuant to either official policy or the custom and practice of Defendant Reynolds County. Horn is sued in both his individual and official capacities.

16.     Defendants John and Janes Does 1-10 are as of yet unidentified persons who were employed by or acting at the direction of Defendant Reynolds County or Defendant Stout and caused or contributed to cause the violation of Adrian Smith's Constitutional rights and/or his resulting death.

<strong><u>VENUE AND JURISDICTION</u></strong>

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in, and, at the time of this action was commenced, at least one of the Defendants was subject to personal jurisdiction in, Reynolds County, Missouri, which lies within the Southeastern Division of the Eastern District of Missouri.

18.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343 inasmuch as Plaintiffs present federal claims arising under the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §§ 1983 and 1988. Further, this Court has jurisdiction under 28 U.S.C. § 1367 to hear Plaintiffs' state law wrongful death claims in that all claims made herein are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution.

19.     At all relevant times herein, all parties are residents of the State of Missouri and therefore this Court has personal jurisdiction over the parties hereto.

<strong><u>ALLEGATIONS COMMON TO ALL COUNTS</u></strong>

20.     At all relevant times herein, Decedent Adrian K. Smith (hereinafter "Adrian") was a resident of Missouri.

21.     Adrian was born on March 8, 1981.

22.     Adrian committed suicide by asphyxia by hanging on November 19, 2018 while in the custody of Reynolds County at the Reynolds County Jail in Centerville, Missouri where he was being held as a pre-trial detainee.

23.     Adrian is survived by two minor natural children, I.S. and E.S., and his natural mother, Plaintiff Maud Smith.

**ADRIAN'S HISTORY OF SERIOUS MENTAL ILLNESS AND SUICIDE ATTEMPTS**

24.     Prior to his death, Adrian had a decades long history of serious mental illness and a history of suicide attempts.

**EARLY 2018 – ADRIAN'S TREATMENT FOR SERIOUS MENTAL ILLNESS**
**(8 Months Prior to Adrian's Detention in Reynolds County Jail)**

25.     In the eleven months prior to his death, Adrian underwent consultations and mental health treatment with the Department of Mental Health, the Crider Center, the B.A.S.I.C. program, and Assisted Recovery Centers of America ("ARCA").

26.     His consultations with the Department of Mental Health reflected that Adrian had attempted suicide twice in his life, that he had been hospitalized overnight at least twice for his mental health problems, and that he began experiencing mental health problems at age 12 or 13 but he was not hospitalized until age 24 or 25.  Among Adrian's stated current problems during the January 2018 consultation were suicide attempts and depression.

27.     His consultations with the Crider Center reflected that Adrian has a history of depression/anxiety and has been hospitalized twice for mental health; that he had attempted suicide twice by cutting his wrists; and that Adrian has been without needed medical/mental health services while using illicit drugs.  He was to go to ARCA in February 2018 for a mental health evaluation and treatment.

28.     His consultations with the B.A.S.I.C. program in January through March 2018 reflected that Adrian had been diagnosed with depression, anxiety, a history of suicide attempts and being hospitalized at least twice for mental health; that Adrian was diagnosed with Bipolar, Depression, and Schizophrenia and that he was prescribed Seroquel, Prozac, and Buspar in February 2018.

29.     His consultations and treatment with ARCA in February 2018 reflect that he has been hospitalized twice for suicide attempts and reflected his prescriptions for Seroquel, Prozac, and Buspar for his diagnosed serious mental illness.

### JUNE 2018 – ADRIAN IS INVOLUNTARILY HOSPITALIZED IN PSYCHIATRIC WARD FOR SERIOUS MENTAL ILLNESS FOLLOWING AN APPARENT SELF-INFLICTED GUNSHOT WOUND
### (3 Months Prior to Adrian's Detention in Reynolds County Jail)

30.     Three months prior to being detained in the Reynolds County jail, Adrian was involuntarily hospitalized in the psychiatric ward of SSM Health for serious mental illness after an apparent self-inflicted gunshot wound in June 2018.  His hospitalization lasted eight days from June 18, 2018 to June 25, 2018.

31.     During his involuntary hospitalization, he was prescribed and administered Risperidone for his psychotic symptoms, Haloperidol for agitation, and Lorazepam for anxiety.

32.     During his involuntary hospitalization, Adrian was again diagnosed with Schizophrenia and Bipolar 1 Disorder.

33.     As a result of his psychosis, Adrian's physicians prescribed and placed him on Risperidone which is an atypical antipsychotic drug.

## SEPTEMBER 22-26, 2018 – ADRIAN IS PLACED ON SUICIDE WATCH IN JEFFERSON COUNTY JAIL IMMEDIATELY PRIOR TO HIS TRANSFER TO REYNOLDS COUNTY JAIL
### (8 Weeks Prior to Adrian's Death)

34.     On September 22, 2018 (four days prior to being transported to the Reynolds County Jail), Adrian was taken into custody by the Jefferson County, Missouri sheriff's department and held in the Jefferson County, Missouri jail as a pre-trial detainee awaiting transfer to Reynolds County.

35.     Upon information and belief, during his period of custody in the Jefferson County jail from September 22, 2018 through September 26, 2018, Adrian was placed on suicide watch.

36.     On September 26, 2018, Defendant Stoops obtained custody of Adrian at the Jefferson County Jail in Hillsboro, MO and transported Adrian to the Reynolds County Jail in Centerville, MO on that same date.

## OCTOBER 12, 2018 – ADRIAN ESCAPES FROM REYNOLDS COUNTY JAIL AND REQUESTS TO BE SHOT BY OFFICERS
### (5 Weeks Prior to Adrian's Death)

37.     On October 12, 2018, Adrian escaped from the Reynolds County jail and his stated purpose for doing so was to attempt to obtain medical treatment for his diagnosed serious mental illness.

38.     On October 12, 2018, Adrian was apprehended approximately two hours after he escaped and he was transported back to the Reynolds County jail.

39.     The officers involved in the search and apprehension of Adrian were Defendants Stout and Newman, as well as two Missouri Highway Patrol Troopers and a Missouri State Park Ranger.

40.     Upon his apprehension, Adrian requested the officers to shoot him.

## OCTOBER 12, 2018 – ADRIAN IS PLACED ON SUICIDE WATCH
## IN REYNOLDS COUNTY JAIL
### (5 Weeks Prior to Adrian's Death)

41.     Upon his return to Reynolds County jail on October 12, 2018, Adrian was placed on suicide watch and was observed at various intermittent times by Defendants Newman, Stout, and Stoops, as well as Deputy Chase Bresnahan.

42.     Adrian was on intermittent suicide watch in Reynolds County Jail for fewer than 24 hours.

43.     Defendants documented this suicide watch on a pre-printed "Reynolds County Jail Suicide Watch" log form which required Defendant to fill out the form by inserting the date and the inmate's name and initial each 15 minute period of time that Adrian was observed.  *See* Exhibit 1, attached hereto and incorporated herein by reference.

44.     In Adrian's personal belongings found in his cell after his death, a letter signed by Adrian states:

> I've asked everyone I could for help and I've been made fun of by these police harassed by the inmates and left to deal with my mental illness alone.  I've asked the Sheriff Tom the night of the escape to please help me get my meds.  I only ran from these people because they told me week after week that my meds had to be brought in to me.  That's not an option for me and I didn't have any other way of getting some relief.  I hoped to make it to a hospital or be killed by the Police to no avail.  I still haven't gotten any medical attention other than the health department coming and sticking people.  I asked those ladies for help and they called the police in to remove me.  I hear voices I see people that I find out later where [sic] never there.  I'm being told to hurt myself and the people around me non-stop and I'm always scared I'll wake up and not remember [sic] I hurt someone.  I cut myself on my right arm a bunch of times with a small razor one of the police left on the bars but I couldn't get to the big vein I was going for.  A week or so later Tom the Sheriff asked me about it took a look while I was being finger printed AND DID NOTHING with a suicadial [sic] inmate but send me back to my cell with the extension cord hanging from the top of the bars.  I fought the temptation to hang myself but when those police looked at me pulling that cord down yesterday and smiled and left it in here I understood they wanted me to hang myself.  I don't care what they think this is torture the voices have never been this bad before.  All I

wanted was some relief hopefully I get it!  I bet these crooked officers destroy this but if by any chance it makes it out, ask anyone who was in there if I asked these police for medical (psych doctor my meds) and they will all say I did over and over. I don't deserve this treatment and I don't deserve to leave this world like this but it's the only way to make the pain stop.  I love everyone who loved me and I hope I live in your memory!

Adrian Smith

*See* Exhibit 2, attached hereto and incorporated herein by reference.

45.     As part of its investigation, the Missouri Highway Patrol also collected another letter at the scene of Adrian's death, which stated:

I begged you all to help me, simply allow me the medications the doctors told me to have. I was called a liar. You said I was playing a crazy card.  You said I was back here causing trouble for no reason.  That theres nothing wrong with me. You gave me a chance to escape and a hope of making it to a hospital then smiled and laughed at me when I didn't make it. You've seen me suffer and haven't lifted a finger but my cell mate gets out of bed too quickly and gets a little dizzy and 3 of you flood into this cell asking if he needs help if an ambulance is needed! All I needed was for these voices to stop and all of you walked past me casting judgment. I'm far from a saint but nothing I've done was worth the pain you've made me endure and for what reason? Why do you people want me off my medications so badly? Why wouldn't you help? Why do I have to make this stop on my own? Why don't I matter? Why are the tools for my own death so readily available? Why do I feel like I'm giving you what you want? I begged you all to help me and I guess you did you gave me this cord after I told you I've tried to kill myself twice. Thanks.

*See* Exhibit 3, attached hereto and incorporated herein by reference.

**NOVEMBER 6, 2018 – ADRIAN FILES WRITTEN INMATE GRIEVANCE FORM
WHEREIN HE DISCUSSES SUICIDE, HIS DIAGNOSED SERIOUS MENTAL
ILLNESS, AND BEGS TO BE SEEN BY A PSYCHIATRIC DOCTOR AND PUT BACK
ON HIS ANTI-PSYCHOTIC MEDICATIONS**
**(Less than 2 Weeks Prior to Adrian's Death)**

46.     On November 6, 2018, less than two weeks prior to his death, Adrian submitted a formal

written grievance form, on a form supplied by Defendant Reynolds County, to Defendant Stout

which stated:

**INMATE GRIEVANCE FORM                      GF-1**

INMATE'S NAME <u>Adrian Keith Smith</u> USP#_____ HOUSING AREA_____

**SECTION 1 – INFORMAL ACTION** (*To be completed by inmate.*)

**Specific nature of grievance (who, what, when, where and how):** I've been
denied medical attention. I've informed officers Steven Stoops, Cody ?, Donald
Horn and Sheriff Tom Stout that I'm prescribed antipsychotic medications and I've
been told they must be brought in.  I've asked to see a psych doctor and haven't
been seen in over a month.  I've had 2 suicide attempts since I've been at Reynolds
County Jail, one of which was made known to the sheriff he asked about it[,] looked
at a week old laceration over top of a large vien [sic] and still hasn't allowed any
medical attention. It's been over a month since I've been without my medications.
**Identify those contacted regarding your grievance and state what YOU HAVE
DONE to resolve the issue:** I've asked for a doctor on at least 7 different accasions
[sic] from Steven Stoops, Cody, Donald Horn Tom Stout.  In front of inmates
Thomas Tindle, Nick Barton, Rodney Clinton, Shannon Arbuckle, Amanda ?
Jennifer ?  I showed my public defender Ayla Chadbourne the the [sic] cuts I made
to myself and asked for a psych doctor.  I've had Becky Peters contact outside
mental health to come interview me that were deined [sic] by the Sheriff Tom Stout.
**What is the specific remedy you seek?:**  To be allowed to be seen by a pych [sic]
doctor and put back on any meds I need.  I hear voices. I see people and things that
aren't there and I go through manic phases where I'm very happy and then end up
so low I attempt suicide.  I would also like not to be punished in anyway [sic] for
writing this grievance.

<u>Adrian Smith 11-6-18</u>
INMATE'S SIGNATURE

*See* Exhibit 4, attached hereto and incorporated herein by reference.

### NOVEMBER 7, 2018 – ADRIAN DRAFTS A FEDERAL LAWSUIT AGAINST DEFENDANT STOUT REQUESTING ONLY THAT HE BE PROVIDED MENTAL HEALTH MEDICAL ATTENTION AND HIS ANTI-PSYCHOTIC MEDICATION
#### (Less than 2 Weeks Prior to Adrian's Death)

47.    Less than two weeks prior to his death, Adrian drafted a federal lawsuit, dated November 7, 2018, against Defendant Stout on a Court-provided 42 U.S.C. §1983 complaint form suing Defendant Stout in his official capacity as Reynolds County Sheriff.

48.    As Adrian's *pro se* federal Complaint reflected, the only relief he requested in the lawsuit was:

> I WANT TO BE SEEN BY A QUALIFIED HEALTH PROFESSIONAL WHO CAN BE TOLD OF MY PSYCH HISTORY AND I CAN RECEIVE THE PROPER MEDICATIONS AND OR BE HOSPITALIZED IF NECESSARY.

*See* excerpt from Exhibit 5, below:

**IV.    Relief**

State briefly and precisely what you want the Court to do for you.  Do not make legal arguments. Do not cite any cases or statutes.  If you are requesting money damages, include the amounts of any actual damages and/or punitive damages you are claiming.  Explain why you believe you are entitled to recover those damages.

```
I WANT TO BE SEEN BY A QUALIFIED MENTAL HEALTH PROFESSIONAL WHO
CAN BE TOLD OF MY PSYCH HISTORY AND I CAN RECEIVE THE PROPER
MEDICATIONS AND OR BE HOSPITALIZED IF NECESSARY.
```

49.    As Adrian's *pro se* federal Complaint reflected, Adrian detailed the efforts to obtain mental health medical attention.  *See* excerpt from Exhibit 5, below:

## II. Statement of Claim

Type, or neatly print, a short and plain statement of the **FACTS** that support your claim(s). For every defendant you have named in this complaint, you must state what he or she personally did to harm you. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Do not make legal arguments, or cite court cases or statutes. You may attach additional pages if necessary.

Your statement of claim must include all of the following information:

1.   What happened to you?
2.   When did it happen?
3.   Where did it happen?
4.   What injuries did you suffer?
5.   What did each defendant personally do, or fail to do, to harm you?

FROM 9-25-18 TO PRESENT SHERIFF STOUT HAS REFUSED ME MY
CONSTITUTIONAL RIGHTS OF MEDICAL CARE.I SUFFER FROM SEVERAL
PSYCHIATRIC MEDICAL PROBLEMS WHICH REQUIRE MEDICATION.MY
REQUEST FOR MEDICAL CARE HAVE GONE UNNOTICED AND OR
IGNORED.I REQUEST EVERYDAY TO SEE A DOCTOR SO I CAN RECEIVE
MY MEDICATIONS. MY POA HAS REQUESTED ON SEVERAL OCCASIONS
FOR A MENTAL HEALTH PROFESSIONAL TO BE ALLOWED TO SEE ME.
SHE HAS PROVIDED PHONE NUMBERS OF AGENCIES WHO WILL COME TO
THE JAIL AND EVALUATE ME TO DETERMINE IF I NEED MEDICATIONS
OR HOSPITALIZATION. HER REQUEST HAVE GONE DENIED. THE
SHERIFF TOLD HER THAT IN HIS OPINION I DO NOT NEED MEDICAL
ATTENTION. I HAVE TRIED 3 TIMES TO COMMITT SUICIDE WHILE IN
REYNOLDS COUNTY. THE LAST TIME I SEVERLY CUT OPEN MY ARM
AND THE JAIL STAFF REFUSED TO CALL 911 OR GIVE ME MEDICAL
ATTENTION.MY POA CALLED THE SHERIFF AND ASKED HIM WHY HE
DIDNT CALL THE NUMBER TO GET ME HELP HE CLAIMS HE WAS

TOTALLY UNAWARE THAT I HAD TRIED TO HURT MYSELF AND HE
WOULD CHECK INTO IT. HE CALLED HER BACK AND IN HIS OPINION
I DID NOT NEED TO BE SEEN BY ANYONE. I HAVE TOLD MY POA
THAT I WANTED TO HANG MYSELF LAST WEEK BUT I STOPPED
BECAUSE MY CELL MATE WAS THERE. SHE AGAIN CALLED THE
SHERIFF AND ADVISED HIM OF WHAT HAPPENED AND AGAIN I WAS
DENIED MEDICAL CARE. I DID TRY TO ESCAPE OF WHICH I HAVE NO
MEMORY OF DOING. I TRIED TO GET TO A DOCTOR OR HOSPITAL FOR
HELP BECAUSE THE VOICES WERE GETTING MORE FREQUENT. NOW
THEY ARE CONSTANT. IM HALLUCINATING SEEING PEOPLE WHO ARENT
THERE. LOSING SPANS OF TIME. MY CELL MATE TELLS ME OF THE
THINGS I DO I HAVE NO RECOLLECTION OF DOING. BECAUSE OF MY
ESCAPE ATTEMPT MY POA IS NO LONGER ALLOWED TO VISIT THEY
CLAIM THAT SHE TRIED TO HELP ME. WHICH IS NOT TRUE SHE HAD
NO IDEA THAT I WAS TRYING TO LEAVE, ALL MY PERSONAL
BELONGINGS HAVE BEEN TAKEN AWAY AND IM NO LONGER RECEIVING
MY MAIL. MY POA SENDS ME A LETTER EVERYDAY AND I HAVE NOT
RECEIVED THEM. I AM NOW IN A CELL WHERE THE SHOWER LEAKS
CONSTANTLY AND FLOODS THE CELL THERE IS MOLD ALL OVER THE
WALLS AND FLOOR. IN RESPONSE TO MY COMPLAINT THEY SHUT THE
WATER OFF SO NOW I CANT SHOWER. I AM NOW CONSTANTLY BEING
SUBJECTED BY THE OTHER PRISONERS TO CONSTANTLY BEING
REFERRED TO BY RACIAL SLURS AND NOTHING IS BEING DONE ABOUT
IT. I BELIEVE THAT BECAUSE IM AFRICAN-AMERICAN IS WHY THE
SHERIFF IS REFUSING MEDICAL CARE AND IS THE REASON IM NOT
RECEIVING MAIL OR VISITATION AND WHY IM IN THE CELL IM IN
AND IN THE SECTION OF THE JAIL IM IN. ON NOVEMBER 6TH 2018
MY POA FOUND OUT THAT THE OTHER PRISONERS GET TAKEN TO
DOCTOR APPOINTMENTS AND CLINICS FOR TEST. WHICH ARISES THE
QUESTION OF IF THEY ARE ALLOWED TO SEE DOCTORS AND RECEIVE
MEDICATIONS WHY AM I NOT ALLOWED THE SAME RIGHT? WHICH GOES
BACK TO ME BEING AFRICAN-AMERICAN.

13

50.     Adrian's lawsuit also referenced the November 6, 2018 formal Inmate Grievance Form filed by Adrian which went directly to Defendant Stout.  *See* Exhibit 5.

51.     Adrian mailed his *pro se* federal Complaint to his close friend, Becky Peters, so that she could file it for him in the federal court in Cape Girardeau.

52.     However Becky Peters did not receive the lawsuit in time to file it prior to Adrian's death, so she mailed the lawsuit to this Court on Adrian's behalf and it was lodged by the clerk of this Court on December 13, 2018, several weeks after Adrian's death.

53.     The lawsuit was styled *Adrian Keith Smith v. Tom Stout Sheriff* and assigned case number 1:18-cv-290.

54.     On March 13, 2019, Judge Ronnie White dismissed the case without prejudice since it was filed posthumously to Adrian's death and Becky Peters was not a real party in interest.


## DEFENDANTS' KNOWLEDGE OF ADRIAN'S NEED FOR ANTI-PSYCHOTIC MEDICATION AND MEDICAL ATTENTION FOR HIS MENTAL ILLNESS

55.     From the start of Adrian's incarceration in Reynolds County through the date of his suicide, Adrian made known by way of multiple direct conversations with Defendants Stout, Huff, Newman, Stoops, Horn, and others at the Reynolds County jail that he had been diagnosed with serious mental illness, was in need of his anti-psychotic medication prescriptions, and was suicidal.

56.     From the start of Adrian's incarceration in Reynolds County through the date of his suicide, Adrian made multiple requests to Defendants Stout, Huff, Newman, Stoops, Horn, and others at the Reynolds County jail to allow Adrian to be examined by a mental health medical professional.

57.     From the start of Adrian's incarceration in Reynolds County through the date of his suicide, Becky Peters, a close friend of Adrian, made known by way of multiple direct in-person conversations and telephone conversations with Defendants Stout, Huff, Newman, Stoops, Horn,

and others at the Reynolds County jail that Adrian had been diagnosed with serious mental illness, was in need of his anti-psychotic medication prescriptions, and was suicidal.

58.     From the start of Adrian's incarceration in Reynolds County through the date of his suicide, Becky Peters, a close friend of Adrian, made multiple requests to Defendants Stout, Huff, Newman, Stoops, Horn, and others at the Reynolds County jail to allow Adrian to be examined by a mental health medical professional.

59.     On November 6, 2018, Adrian filed the formal Inmate Grievance Form, discussed above, with Defendant Stout wherein Adrian again informed them of his serious mental illness, his need for his anti-psychotic medication prescriptions, his suicidal tendencies, that he already had attempted suicide twice while in Reynolds County jail, and his need for mental health medical attention.

60.     Defendants were also aware of Adrian's suicidal tendencies surrounding his October 12, 2018 escape from Reynolds County jail and Defendants' decision to place Adrian on suicide watch upon his capture, as more fully discussed above, and in addition, other pretrial detainees in the jail expressed their concerns to Defendants about Adrian's psychotic behavior and mental illness.

61.     Despite their knowledge of these issues, Defendants never allowed Adrian to be examined by a mental health medical professional or to obtain his anti-psychotic medication prescriptions.

62.     Further, a reasonable person observing Adrian's behavior during his detention at Reynolds County Jail and being repeatedly informed about his serious diagnosed mental illness and anti-psychotic medication prescriptions would conclude that he needed to be seen by a mental health medical professional and be provided with his necessary medications.

**DESPITE ADRIAN'S MENTAL ILLNESS AND SUICIDAL BEHAVIOR,
DEFENDANTS ALLOWED ADRIAN UNSUPERVISED ACCESS TO A
<u>LONG ORANGE EXTENSION CORD</u>
IN HIS CELL AND
FAILED TO MONITOR ADRIAN OR OTHER DETAINEES FOR EXTENDED
PERIODS OF TIME**

63.    For at least several weeks leading up to Adrian's suicide on November 19, 2018,

Defendants allowed Adrian immediate unsupervised access to a long orange extension cord that

was powering a box fan on the floor a few inches outside his cell bars along with a gallon jug of

water, such that Adrian could easily reach both items. Those items are pictured below on

November 19, 2018, at the time of Adrian's suicide.



64.    There were no guards in the Reynolds County Jail at night.

65.    Pre-trial detainees were also allowed to keep shaving razors in their cells.

## NOVEMBER 19, 2018 – ADRIAN COMMITS SUICIDE
## IN REYNOLDS COUNTY JAIL BY HANGING HIMSELF WITH THE
## LONG ORANGE EXTENSION CORD

66.     On the night of November 18, 2018 (prior to Adrian's death in the early morning hours of November 19, 2018), there were no guards in the Reynolds County Jail.

67.     The only person besides pre-trial detainees in the Reynolds County Jail was dispatcher Jonathan Stout, whose office is in the front of the building away from the detainees.

68.     In case of an emergency, the only way the detainees can get any assistance is to make as much noise as possible by banging and kicking on the jail cell doors for extended periods of time until the night dispatcher eventually hears them.

69.     Upon information and belief, the night dispatcher is not allowed to enter the jail cells and can only offer assistance by dispatching other emergency services to come to the jail to render aid.

70.     Upon information and belief, Jonathan Stout did not know where the keys to the jail cells were located.

71.     On November 19, 2018 at approximately 1:40 a.m., Adrian's cell mate, Shannon Arbuckle, awoke to use the bathroom and noticed Adrian lying against the cell bars motionless.

72.     Mr. Arbuckle then began banging and kicking on the jail cell door in an effort to alert the night dispatcher, Jonathan Stout, that there was an emergency in the cell.

73.     Approximately 7 minutes later, Jonathan Stout heard the noise and came back to the cell area wherein Mr. Arbuckle told Jonathan Stout that Adrian hanged himself.

74.     At 1:49 a.m., Jonathan Stout went back to the dispatch office and radio dispatched Defendant Huff and Deputy Chase Bresnahan who were out on patrol together in Lesterville, Missouri.

75.     At 1:51 a.m., Jonathan Stout then radio dispatched Emergency Medical Services from the Reynolds County Ambulance District (hereinafter "EMS") located in Centerville, MO.

76.     EMS and Defendant Huff and Deputy Chase Bresnahan eventually arrived at the jail after receiving the dispatch call.

77.     Upon arrival of Defendant Huff and Deputy Chase Bresnahan, they proceeded to find the keys and enter Cell 3 where Adrian and Mr. Arbuckle were housed.

78.     Deputy Chase Bresnahan removed Mr. Arbuckle from the cell and placed him in another cell where two other detainees were located.

79.     When Defendant Huff entered the cell, he observed that Adrian was hanging from an orange extension cord in the rear of Cell 3 by the bars.  Adrian was lying against the bars with his body partially on the floor and partially on the bars with an orange extension cord wrapped around his neck and blood coming from his mouth.

80.     Defendant Huff further observed that the orange extension cord was tied around Adrian's neck with a black cloth wrapped around and tied around his neck as well.

81.     EMS was then permitted to enter the cell and attempt lifesaving treatment on Adrian.

82.     Lifesaving procedures did not work and Adrian was pronounced dead at 1:59 a.m. on November 19, 2018.  Adrian is pictured below in his cell on November 19, 2018, shortly after his death, and the long orange extension cord is next to his body.



83.     Defendants Stout and Stoops arrived at the jail at 2:58 a.m. (1 hour and 18 minutes after

Mr. Arbuckle first discovered Adrian).

### THE MISSOURI HIGHWAY PATROL'S INVESTIGATION OF ADRIAN'S DEATH

84.     On the morning of Adrian's death, the Missouri Highway Patrol conducted an investigation

into Adrian's death.

85.     Missouri Highway Patrol Trooper Paul Wells processed the scene of Adrian's death noting

it was:

> located in cell 3 of the Reynolds County Jail in Centerville, Missouri. During
> processing of the scene, I observed Smith lying on his back, wearing orange jail
> pants, white socks, and a white t-shirt that had been cut open up the front. Smith
> had apparent foam coming from his nose and mouth and cardiac leads attached to
> his chest and legs that were placed there by EMS prior to my arrival. Officers who
> first responded to the scene had reportedly discovered Smith hanging from an
> extension cord wrapped around his neck, with a piece of black fabric between the
> cord and Smith's neck. The cord and fabric were removed from Smith's neck prior
> to my arrival. The end of an orange extension cord was lying near Smith's head and
> the cord extended vertically to a height of 7 feet, where it was wrapped around a
> jail cell bar. From there it was wrapped around a second jail cell bar and traced back
> to an electrical outlet. The fabric was lying near a desk in the cell and both the cord
> and fabric were collected as evidence. Further search of the items contained in the
> cell reveled several letters that were both written by Smith and some written to him.
> An examination of these letters and documents showed they contained multiple
> letters written by Smith to his children and mother, that detailed his plan to commit

suicide by hanging himself with the orange electrical cord. In these letters, Smith details that he suffered from mental illness, expresses his desire to receive treatment for this, and explains that his mental illness was the driving force behind his decision to commit suicide. The original letters that detailed Smith's suicidal tendencies were collected as evidence. Also located in the cell was a grievance form completed by Smith on November 6, 2018, that detailed his mental illness, including suicidal tendencies, and his desire to receive treatment for them. This form was collected as evidence.

## COUNT I
## VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1983
## AGAINST DEFENDANTS STOUT, HUFF, NEWMAN, STOOPS, HORN, AND DOES 1-10

86.     Plaintiffs incorporate all preceding allegations of this Complaint as if fully set forth herein.

87.     Defendants Stout, Huff, Newman, Stoops, Horn, And Does 1-10 are sued under this Count I – 42 U.S.C. §1983 claim in their individual capacities.

88.     Plaintiffs bring Count I of this cause of action against Defendants pursuant to 42 U.S.C. § 1983 for damages for Defendants' deprivation of Adrian's constitutionally protected liberty rights by reason of Defendants' violation of Adrian's substantive and due process rights pursuant to the Eighth and Fourteenth Amendments of the Constitution of the United States of America.

89.     Adrian had a clearly established right to be protected from the known risks of suicide and to have his serious medical needs attended to.

90.     Adrian had objectively serious diagnosed medical needs from the time of his detention in Reynolds County jail through the date of his death. Those serious medical needs had been diagnosed as recently as three months before his detention in Reynolds County Jail following an involuntary hospitalization in the psychiatric ward for mental illness after an apparent self-inflicted gunshot wound in June 2018.

91.     Adrian's medical need was so obvious that a reasonable person would easily recognize the need for medical attention, and at the very least, that Adrian needed a medical assessment.

92.     Adrian's serious diagnosed medical need was apparent by his psychotic behavior while detained in Reynolds County, by his actions outlined above, by his directly and repeatedly communicating those needs to Defendants, by others including Becky Peters and other pre-trial detainees directly and repeatedly communicating those needs to Defendants, and by the fact that Defendants had previously made the determination to place Adrian on suicide watch while in the custody of Reynolds County jail five weeks prior to Adrian's death.

93.     As outlined more fully above, over the course of his two-month incarceration, both Adrian and Becky Peters repeatedly advised Defendants of Adrian's serious diagnosed medical needs, his lack of current anti-psychotic medication prescriptions, his suicidal behaviors and thoughts, and his need to be seen by a mental health medical provider. Other pre-trial detainees also advised Defendants of these issues and Adrian's erratic behavior.

94.     Defendants knew of Adrian's serious medical needs, including the serious, imminent and substantial risk of self-harm and suicide and need for screening, monitoring and assistance to prevent his death by hanging, but willfully and recklessly failed to respond reasonably to these known risks and needs. Armed with this knowledge, Defendants, acting alone and in concert, were deliberately indifferent to Adrian's serious medical needs in that Defendants, *inter alia*:

     a.     ignored Adrian's obvious and severe mental illnesses, including Schizophrenia and Bipolar 1 Disorder, and substantial risk of suicide;

     b.     failed to provide or obtain medical treatment and/or therapy for Adrian's diagnosed conditions, including Schizophrenia and Bipolar 1 Disorder, and substantial risk of suicide;

c.      failed to investigate Adrian's mental illnesses and substantial risk of suicide enough to make an informed judgment about his medical needs;

d.      made medical decisions about Adrian's treatment and/or therapy for his diagnosed conditions and substantial risk of suicide based on non-medical factors, such as budgetary constraints and lack of staff;

e.      prevented or interfered with Adrian's access to treatment and/or therapy for his diagnosed conditions and substantial risk of suicide;

f.      failed to take reasonable measures to abate the known risk of Adrian's suicide;

g.      provided and failed to remove dangerous items from Adrian's cell or person that Adrian could use to harm himself – namely, for a period of at least two weeks prior to Adrian's death, Defendants furnished Adrian with immediate unsupervised access to a long orange extension cord located next to his cell bars from which the extension cord could be anchored to create gallows, and failed to monitor him for extended periods of time, including the entire evening prior to his death on November 19, 2018;

h.      failed to place Adrian on suicide watch or closely monitor his cell and his behavior;

i.      failed to perform visual checks necessary to monitor Adrian's actions and condition;

j.      otherwise intentionally or recklessly disregarded Adrian's right to adequate medical care.

95.    A reasonable jailer would have understood that the actions and inactions described above, including the failure to seek medical care for one who exhibited the signs that Adrian exhibited, would violate his constitutional rights.

96.    Defendants' conduct was well defined by law and each Defendant knew or reasonably should have known that their conduct would fall well below the standard prescribed by law.

97.    In committing the acts and omissions complained of herein, Defendants acted under color of state law to show deliberate indifference to Adrian's constitutional rights.

98.    As a direct and proximate result of Defendants' constitutional violations, combining, concurring and contributing, Adrian died on November 19, 2018.

99.    As a direct and proximate result of Defendants' constitutional violations, combining, concurring and contributing, Adrian's mental condition deteriorated, Adrian endured conscious pain and suffering and Adrian experienced a general decline in the quality of his life between the time he entered Reynolds County Jail and the time of his death.

100.    As a direct and proximate result of Defendants' constitutional violations, combining, concurring and contributing, Adrian has suffered pecuniary losses, including but not limited to, the expenses associated with Adrian's funeral.

101.    As a direct and proximate result of Defendants' constitutional violations, combining, concurring and contributing, Adrian caused to suffer loss of services, companionship, comfort, instruction, guidance, counsel and support.

102.    Defendants' outrageous acts and omissions as referenced in detail above show Defendants acted intentionally, maliciously, with evil motive, with reckless indifference, and/or with callous indifference to federally protected rights of others, and to the health, safety and welfare of Adrian, thereby warranting an award of punitive and exemplary damages against each said Defendant.

103.    42 U.S.C. §1988(b) provides in pertinent part: In any action or proceeding to enforce a provision of sections … 1983… of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs…

WHEREFORE, Plaintiffs pray the Court enter a judgment on Count I in favor of Plaintiffs and against Defendants, awarding as follows:

- Compensatory and non-economic damages in a reasonable amount to be determined by a jury;

- Punitive and exemplary damages in an amount sufficient to deter Defendants and others from like conduct;

- Reasonable attorney's fees and costs incurred in this action pursuant to 42 U.S.C. §§ 1983 and 1988; and

- Such other and further relief as the Court deems just and proper, together with costs and interest.

## COUNT II
## VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1983
## AGAINST DEFENDANTS REYNOLDS COUNTY AND STOUT

104.   Plaintiffs incorporate all preceding allegations of this Complaint as if fully set forth herein.

105.   Defendants Reynolds County and Stout were supervisors during Adrian's two month detention in Reynolds County Jail, and Defendants had a duty to properly supervise, manage and train officers, particularly in training those officers the proper methods of protecting detainees from the known risks of suicide and to have detainees' serious medical needs attended to.

106.   Defendants, having supervisory capacities, custody, rule, keeping and charge of the Reynolds County Jail and its detainees, having notice that the training and supervision of the jailers were lawfully inadequate and likely to result in constitutional violations of detainees, including Adrian, maintained unconstitutional policies, customs and procedures and were deliberately indifferent, in that they, *inter alia*:

a.   failed to train and supervise jail administrators, jailors, officers, and dispatchers on suicide prevention, identification and/or monitoring of at-risk detainees, detection and confiscation of dangerous items on detainees' persons and in cells, intake policies and procedures, and basic emergency responses to suicide attempts;

b.   failed to implement or require the implementation of a suicide prevention or response policy and procedure, or maintained inadequate suicide prevention and response and intake policies and procedures that did not identify and/or monitor at-risk detainees, permitted dangerous items to remain with at-risk detainees and failed to adequately monitor detainees;

c.   failed to enforce suicide prevention or response policies and procedures and to discipline officers for violations of such policies and procedures, and caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures;

d.   failed to adequately staff the jail facility; and/or

e.   otherwise were deliberately indifferent to or tacitly authorized acts of their subordinates that violated at-risk detainees' and Adrian's constitutional rights.

107.   As set forth more fully herein, Adrian's serious medical needs were repeatedly made known to Defendants and Defendants ignored those needs and failed and refused to provide Adrian with any medical attention to his serious medical needs.

108.   Defendants Reynolds County and Stout, in failing to supervise, manage and train deputies, jailors and other employees of Defendant Reynolds County, permitted a culture of unconstitutional treatment of detainees without repercussion, particularly of detainees such as Adrian.  The individual defendant deputies named herein were allowed to neglect and mistreat Adrian and

ignore his serious medical condition, fail to monitor Adrian for extended periods of time, allow Adrian immediate unsupervised access to dangerous objects – namely the long orange extension cord next to Adrian's cell bars from which the extension cord could be anchored to create gallows, and cause or contribute to cause Adrian's death without fear of repercussions. This failure to supervise, manage and train was a moving force and but-for cause of the unconstitutional treatment and abuse of Adrian, including his death.

109.    Further, as set forth more fully herein, the need for more or different training was so patently obvious, and the inadequacy so likely to result in the violation of constitutional rights, that Defendants can reasonably be said to have been deliberately indifferent to the need and the failure to train and supervise was a result of deliberate and conscious choice by Defendants.

110.    As a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Adrian died on November 19, 2018.

111.    As a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Adrian's mental condition deteriorated, Adrian endured conscious pain and suffering and Adrian experienced a general decline in the quality of his life between the time he entered Reynolds County Jail and the time of his death.

112.    As a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Adrian has suffered pecuniary losses, including but not limited to, the expenses associated with Adrian's funeral.

113.    As a direct and proximate result of Defendants' unconstitutional policies, customs, and procedures, combining, concurring and contributing, Adrian was caused to suffer loss of services, companionship, comfort, instruction, guidance, counsel and support.

114.    Defendants Reynolds County and Stout's outrageous acts and omissions as referenced in detail above show the Defendants acted intentionally, maliciously, with evil motive, with reckless indifference, and/or with callous indifference to federally protected rights of others, and to the health, safety and welfare of Adrian, thereby warranting an award of punitive and exemplary damages against each said Defendant.

115.    42 U.S.C. §1988(b) provides in pertinent part: In any action or proceeding to enforce a provision of sections … 1983… of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs…

WHEREFORE, Plaintiffs pray the Court enter a judgment on Count II in favor of Plaintiffs and against Defendants, awarding as follows:

- Compensatory and non-economic damages in a reasonable amount to be determined by a jury;

- Punitive and exemplary damages in an amount sufficient to deter Defendants and others from like conduct;

- Reasonable attorney's fees and costs incurred in this action pursuant to 42 U.S.C. §§ 1983 and 1988; and

- Such other and further relief as the Court deems just and proper, together with costs and interest.

## COUNT III
## WRONGFUL DEATH
## AGAINST ALL DEFENDANTS
### RSMo. §537.080

116.    Plaintiffs incorporate all previous paragraphs this Complaint as if fully set forth herein.

117.    Plaintiffs bring Count III of this cause of action against Defendants, and they do so individually as Adrian's natural mother and natural sons, pursuant to Mo. Rev. Stat. §§ 537.080 and 537.090.

118.    Defendants Stout, Huff, Newman, Stoops, Horn, And Does 1-10 are sued in their official capacities and in their individual capacities under this Count III – Wrongful Death RSMo. §537.080 claim.

119.    Defendants, through their training and experience, were aware of the heightened risk of pre-trial detainees committing or attempting to commit suicide.

120.    Defendants knew or should have known of the serious medical needs of at-risk detainees, and Defendants knew or should have known of the serious medical needs and serious and substantial risk of suicide presented by Adrian.

121.    Defendants had to a duty to provide adequate medical care to address the needs of at-risk detainees, including Adrian, and to take reasonable remedial or preventative measures to avert suicides and suicide attempts by detainees, including Adrian.

122.    Missouri law provides that Defendant Stout, as the sheriff, shall have the custody, rule, keeping and charge of the jail within his county, and of all the prisoners in such jail, and may appoint a jailer under him, for whose conduct he shall be responsible.

123.    Missouri law provides that Defendants Huff, Newman, Stoops, Horn, as deputy sheriffs, shall possess all the powers and may perform any of the duties prescribed by law to be performed by the sheriff.

124.    Defendants Stout, Huff, Newman, Stoops, Horn, and others at the Reynolds County jail were all jailers of the detainees in the Reynolds County jail, including Adrian.

125.    Defendants, individually, and as officers and employees, owed a duty of care to provide humane conditions of confinement, ensuring that detainees receive adequate medical care, and taking reasonable measures to guarantee the safety of the inmates, including Adrian.

126.    Missouri law prescribes a ministerial duty to jailers that the jailers shall procure the necessary medicine…or medical attention necessary or proper to maintain the health of the prisoner.  This duty arises the moment the person comes into custody and extends until his discharge.

127.    Despite Adrian's long history of mental illness and suicidal behavior, including *inter alia*:

- Adrian's involuntary hospitalization in June 2018 for an apparent self-inflicted gunshot wound (3 months prior to being in Reynolds County jail) wherein he was diagnosed with Schizophrenia and Bipolar 1 Disorder and placed on prescription anti-psychotic medication;

- Adrian being placed on suicide watch in Jefferson County jail immediately prior to his transfer to Reynolds County jail;

- Adrian's October 12, 2018 escape from Reynolds County Jail wherein his stated reason was to attempt to get medical attention and upon his capture he requested that the officers shoot him;

- Adrian being placed on suicide watch in Reynolds County jail on October 12, 2018 and during said time was observed by Defendants Stout, Newman, and Stoops, as well as Deputy Chase Bresnahan;

- And despite Adrian and others' repeated requests to Defendants to allow Adrian to be seen by a mental health medical provider due to his diagnosed serious mental illness, lack of current anti-psychotic medications, and suicidal behavior;

Defendants failed and refused to allow Adrian medical attention for his serious diagnosed medical condition.

128.    Upon information and belief, there were other ministerial policies, procedures, customs, or orders in effect at the Reynolds County jail that required detainees to be placed on suicide watch when exhibiting signs of potential suicidal behavior or ideations.  Such mandatory suicide watch required Defendants to, among other things, observe Adrian at least every fifteen minutes and notate each such observation on the pre-printed "Reynolds County Jail Suicide Watch" log form, as was used when Adrian was placed on suicide watch on October 12, 2018, as more fully discussed above.

129.    Prior to his death, Adrian exhibited multiple signs of serious mental illness and suicidal behavior and ideations to Defendants, and in addition, Adrian and Becky Peters repeatedly stated those concerns to Defendants, even going so far as filing a formal grievance and drafting a federal lawsuit, all for the purpose of attempting to get needed mental health medical attention to alleviate his diagnosed serious mental illness which ultimately resulted in suicide on November 19, 2018.

130.    Despite Adrian's exhibiting these multiple signs of serious mental illness and suicidal behavior and ideations, Defendants failed and refused to place Adrian on suicide watch or otherwise properly monitor Adrian and take further measures to abate the risk of suicide in violation of the aforesaid ministerial duty.

131.    Upon information and belief, there were other ministerial policies, procedures, customs, or orders in effect at the Reynolds County jail that required the Defendants to remove from detainees' cells dangerous objects and object that could be used by detainees to attempt or commit suicide.

132.    For at least several weeks prior to Adrian's death and while Adrian was exhibiting suicidal behavior and begging Defendants to allow a mental health medical provider to see Adrian,

Defendants provided Adrian with immediate unsupervised access to the long orange extension cord next to Adrian's cell bars from which the extension cord could be anchored to create gallows. It was patently obvious that such an object would clearly be a dangerous object that a detainee could use to commit suicide, especially a detainee such as Adrian who had been exhibiting suicidal ideations and behavior.

133.    Defendants' provision of, and failure to remove, the aforesaid dangerous object, namely the long orange extension cord next to Adrian's cell bars, from Adrian was a violation of a ministerial duty.

134.    Over the course of Adrian's incarceration in Reynolds County from September 26, 2018 through the date of his death, November 19, 2018, Defendants were made aware on numerous occasions by Adrian's conduct and by direct communications from Adrian and Becky Peters concerning Adrian's serious diagnosed mental illness, his suicidal behavior and ideations, his need for his prescription anti-psychotic medications, and his need to be seen by a mental health medical provider such that Defendants were not faced with an emergency medical situation, but rather a ministerial duty to provide the necessary medical attention to maintain Adrian's health.

135.    These ministerial duties arise not only by specific rule, law, or order, but also by the nature of Defendants' position as jailers, and by Article I, Section 21 of the Missouri Constitution which prohibits the infliction of cruel and unusual punishment.

136.    Upon information and belief, there were additional ministerial policies, rules, procedures, orders, or customs regarding inmate safety, health care, and suicide prevention that were in effect at the Reynolds County Jail at the time of Adrian's death that Defendants failed to abide by.

137.    Defendants Stout, Huff, Newman, Stoops, Horn, And Does 1-10 were negligent, derelict, reckless, and breached their ministerial duties of care in at least one of the following respects:

a.  ignored Adrian's obvious and severe mental illnesses, including Schizophrenia and Bipolar 1 Disorder, and substantial risk of self-harm and suicide and failed in the ministerial duty to adequately screen or assess Adrian in light of said known risk;

b.  prevented or interfered with Adrian's ability to obtain his medication prescriptions or to otherwise obtain medical treatment and/or therapy for Adrian's diagnosed conditions, including Schizophrenia and Bipolar 1 Disorder, and substantial risk of suicide;

c.  failed to investigate Adrian's mental illnesses and substantial risk of suicide enough to make an informed judgment about his medical needs;

d.  made medical decisions about Adrian's need for medical treatment and/or therapy for his diagnosed conditions and substantial risk of suicide based on non-medical factors, such as budgetary constraints and lack of staff;

e.  prevented or interfered with Adrian's access to treatment and/or therapy for his diagnosed conditions and substantial risk of suicide;

f.  failed to take  reasonable measures to abate the known risk of Adrian's suicide;

g.  failed to control and properly monitor Adrian's psychotic and depressive behavior;

h.  failed to remove dangerous items from Adrian's cell or person that Adrian could use to harm himself;

i.  failed to place Adrian on suicide watch or closely monitor his cell and his behavior;

k.  failed to properly conduct visual checks of Adrian's condition by performing in-person cell checks and/or by viewing the video display screens; and/or

l.  otherwise intentionally or recklessly disregarded Adrian's right to adequate medical care.

138.    At all times relevant herein, Defendant Reynolds County acted by and through its employees, departments, officers, administrators, servants, and agents including Defendants Stout, Huff, Newman, Stoops, Horn, and others at the Reynolds County jail and Defendant Reynolds County is vicariously liability for the negligent action and failure and omissions of each of those persons under the doctrine of *respondeat superior*.

139.    Defendant Reynolds County had a duty to maintain the Reynolds County Jail in a reasonably safe condition.

140.    That although Defendant was aware of the risk of pre-trial detainees committing suicide while in custody, Defendant permitted a dangerous condition to exist in Adrian's cell in the form of the aforementioned immediate unsupervised access to the long orange extension cord next to Adrian's cell bars from which the extension cord could be anchored to create gallows, and inadequate detainee monitoring and surveillance, and inadequate suicide prevention protocols thereby breaching its duty of care owed to Adrian.

141.    Additionally, Defendant Stout, as the Sheriff, supervisor, and/or administrator having supervisory capacities, and Defendant Reynolds County, maintained deficient and inadequate policies, customs and procedures and were negligent and careless, in that they:

    a.    failed to train and supervise jail administrators, jailors, officers, and dispatchers on suicide prevention, identification and/or monitoring of at-risk detainees, detection and confiscation of dangerous items on detainees' persons and in cells, intake policies and procedures, and basic emergency responses to suicide attempts;

    b.    failed to implement or require the implementation of a suicide prevention or response policy and procedure, or maintained inadequate suicide prevention and response and intake policies and procedures that did not identify and/or monitor at-

risk detainees, permitted dangerous items to remain with at-risk detainees, and inadequate monitoring and surveillance of detainees, including Adrian;

c.      failed to enforce suicide prevention or response policies and procedures and to discipline officers for violations of such policies and procedures, and caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures;

d.      failed to adequately staff the jail facility; and/or

e.      otherwise were negligent and careless or tacitly authorized the negligent and careless acts of their subordinates to the detriment of Adrian.

142.    Defendant Reynolds County had actual or constructive notice of the dangerous condition on its premises in sufficient time prior to Adrian's death to have taken measures to protect against the dangerous condition.

143.    As more fully set forth herein, the dangerous condition on Defendant's premises created a reasonably foreseeable risk of harm of the kind of injury which occurred.

144.    The aforesaid acts and omissions of Defendants and each of them directly and proximately caused or contributed to cause, and were the cause in fact of, Adrian's death.

145.    The aforesaid acts and omissions of Defendants and each of them directly and proximately caused or contributed to cause, and were the cause in fact of, Adrian to endure pain and suffering between the time he entered the Reynolds County Jail and the time of his death.

146.    The aforesaid acts and omissions of Defendants and each of them directly and proximately caused or contributed to cause, and were the cause in fact of, Plaintiffs suffering the loss of Adrian's services, consortium, companionship, comfort, instruction, guidance, counsel, training and support.

147.    The aforesaid acts and omissions of Defendants and each of them directly and proximately caused or contributed to cause, and were the cause in fact of,  Plaintiffs' pecuniary losses, including but not limited to funeral expenses.

148.    The aforesaid acts and omissions of Defendants and each of them directly and proximately caused or contributed to cause, and were the cause in fact of, Plaintiffs to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090.

149.    Further, the aforesaid acts and omissions of Defendants, and each of them, were willful, wanton and outrageous and displayed a conscious disregard and complete indifference to health and safety of Adrian, and the rights of Plaintiffs, thereby warranting an award of punitive and exemplary damages against each said Defendant.

150.    Defendant Reynolds County waived sovereign immunity pursuant to Mo. Rev. Stat. § 537.600 by knowingly maintaining a dangerous condition on its premises which created a reasonably foreseeable risk of harm to detainees and which directly caused or contributed to cause injury to Adrian and Plaintiffs.

151.    Defendant Reynolds County carried a policy of liability insurance and/or a self-insurance plan in effect at all times relevant herein which provides coverage for the claims asserted herein, and therefore sovereign immunity is further waived as to Defendant Reynolds County pursuant to Mo. Rev. Stat. § 537.610.

WHEREFORE, Plaintiffs pray that the Court enter judgment in Count III herein in favor of Plaintiffs and against Defendants and each of them, as follows:

- •    Compensatory and non-economic damages in a reasonable amount to be determined by a jury;

- Punitive and aggravating circumstances damages in an amount sufficient to deter Defendants and others from like conduct; and

- Such other and further relief as the Court deems just and proper, together with costs and interest.

### COUNT IV
### PUNITIVE DAMAGES
### AGAINST ALL NAMED DEFENDANTS

152.    Plaintiffs incorporate all preceding allegations of this Complaint as if fully set forth herein.

153.    The aforesaid conduct of Defendants was so grossly negligent, reckless, malicious and in bad faith that it shows that Defendants acted with complete indifference to or a conscious disregard for the health, safety and welfare of Adrian, and therefore warrants the imposition of punitive damages against Defendants in such sums so as to punish Defendants and deter them and others from such conduct now and in the future.

WHEREFORE and for the foregoing reasons, Plaintiffs respectfully request this Court enter judgment against Defendants for punitive damages in such sum so as to punish Defendants and deter them and others from like tortious conduct now and in the future; and for Plaintiffs' costs herein incurred and expended, and for such further relief the Court deems just and proper.

### <u>DEMAND FOR JURY TRIAL</u>

154.    Plaintiffs hereby demand trial by jury on all of the above issues so triable.

Respectfully submitted,

/s/ Stephen E. Walsh
Stephen E. Walsh  #24992MO
WALSH & WALSH LLC
Attorneys at Law
635 North Main Street
Poplar Bluff, MO 63901
(573) 712-2909 (Telephone)
(573) 712-2912 (Facsimile)
swalsh@walsh-firm.com

/s/ John S. Steward
John S. Steward #45932MO
Steward Law Firm, LLC
14824 West Clayton Road, Suite 24
Chesterfield, MO 63017
Tel.  (314) 504-0979
Fax: (314) 594-5950
js@MoLawGroup.com

/s/ Justin L. Mason
Justin L. Mason #62571MO
THE LAW OFFICES OF
JUSTIN L. MASON, LLC
1917 Rutger Avenue,  Suite A
St. Louis, MO 63104
Tel. (618) 441-0163
justin@justinmasonesq.com

**ATTORNEYS FOR PLAINTIFFS**